**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**JOAN N. PRICHARD,**

       **Plaintiff,**

**v.**                                                   **Case No. 3:05cv40/RV/MD**

**MICHAEL L. DOMINGUEZ,[1]**
**ACTING SECRETARY,**
**DEPARTMENT OF THE AIR FORCE,**

       **Defendant.**

_____/

## ORDER

Pending is Defendant Michael L. Dominguez's motion for summary judgment (Doc. 18). Plaintiff Joan N. Prichard has filed a "Statement of Facts in Dispute" in opposition thereto (Doc. 25), to which Defendant has filed a reply (Doc. 28).[2]

This employment discrimination case involves a one-count claim of disability discrimination filed under the Rehabilitation Act of 1973, as amended [29 U.S.C. § 701, *et seq*]. The parties have had full opportunity for discovery, and Defendant now moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The following facts are undisputed or, if disputed, resolved in favor of Plaintiff.

---

[1]Plaintiff filed her Complaint in this case on February 10, 2005, against former Secretary of the Air Force James G. Roche. Mr. Roche resigned his office one month prior, in January 2005, and Michael L. Dominguez is now the Acting Secretary. Mr. Dominguez is hereby substituted as Defendant. Fed. R. Civ. P. 25(d)(1).

[2]In her opposition, which was filed on January 25, 2006, Plaintiff referenced multiple exhibits purportedly "being submitted in hard copy to the Clerk." However, these exhibits were not filed with this Court until June 7, 2006 (Doc. 30) --- nearly four months too late. See Order (Doc. 26) (setting an advisement date and ordering all evidentiary material vis-a-vis summary judgment to be filed by February 15, 2006). Nonetheless, despite its late receipt, I will consider Plaintiff's submission.

## I.     BACKGROUND

### A.     Facts

In or around September 1998, Plaintiff began working as the civilian Deputy Director of Public Affairs and Community Relations Chief at Headquarters Air Force Special Operations Command at Hurlburt Field, Florida ("HQ"). See Plaintiff's Statement of Facts in Dispute ("Pl. Stmt.") (Doc. 25), at ¶1; see also Statement of Facts Relied Upon in Support of Motion for Summary Judgment ("Def. Stmt.") (Doc. 19), at ¶1. It was Plaintiff's job to help establish and maintain the relationship and information channels between HQ and the public. See Def. Stmt. Ex. 2. To that end, Plaintiff's position description required, *inter alia*, that she work under the direct administrative supervision of the Director of Public Affairs; work closely with the director in planning and formulating Air Force Special Operations Command policies; serve as the acting director in the director's absence; and follow all the appropriate security regulations to "ensure classified material is controlled." See id.

When Plaintiff first arrived at HQ, her direct supervisor was Major Stephanie (Young) Bindemann. See Pl. Stmt. at ¶3. Major Bindemann was transferred in 2000, and Major Karen A. Finn assumed the role of Director of Public Affairs on July 18, 2000. See id.; Def. Stmt. Ex. 3. As part of her duties, Major Finn was charged with ensuring that her subordinates, including Plaintiff, had adequate and proper security training. See Def. Stmt. at ¶4. In May or June 2001, Major Finn appointed Plaintiff to the position of security manager. See id.; Pl. Stmt. at ¶4. It appears from the record that Plaintiff worked under Major Finn without incident from July 2000 to February 2002.

On or about February 14, 2002, Major Finn learned that Plaintiff was involved in a "security breach." See Def. Stmt. Ex. 5. In short, Plaintiff played a role (albeit indirectly) in the unauthorized disclosure of classified material to the news media --- namely, National Public Radio ("NPR"). See id. The breach was investigated and, on June 26, 2002, Major Finn recommended that Plaintiff be suspended for three days.

See Def. Stmt. Ex. 6.[3]

On or about September 5, 2002, Plaintiff was involved in another security-related incident. This time, it was believed Plaintiff had improperly kept a notebook containing classified information in her car.  See Def. Stmt. Ex. 7. The incident was the subject of a separate investigation, during which, on September 10, 2002, Major Finn temporarily suspended Plaintiff's access to classified information.  See id.; see also Def. Stmt. Ex. 8.[4]

It appears Plaintiff did not respond well to her second suspension, although it is unclear from the record exactly what happened. The record does reveal, however, that one day after her access to classified information was suspended, on September 11, 2002, Major Finn called Plaintiff at home and recommended that she seek mental health counseling. See Pl. Stmt. at ¶9. The following day, on September 12, 2002, Major Finn enrolled Plaintiff in a "stress management" training course. See id.; Pl.

---

[3]Plaintiff strongly disputes that she was at fault for the NPR security breach. See Pl. Stmt. at ¶5. To support her argument, Plaintiff points out that an arbitrator later determined that her suspension was unwarranted. See id. As Defendant notes, however, the arbitrator did not find that Plaintiff was faultless; rather, he just found a 3-day suspension was excessive, so he reduced her penalty to an oral reprimand. See Pl. Stmt. Ex. 9. In any event, this disputed fact is not at all material to the case; whether Plaintiff was or was not at fault for the security breach is irrelevant to her claim of disability discrimination. Plaintiff argues, however, that Major Finn did not suspend other employees who were involved in the breach, implying discrimination. See Pl. Stmt. at ¶5. This argument fails because, as will be discussed infra, Major Finn recommended the 3-day suspension several months before Plaintiff was diagnosed with the medical condition underlying this lawsuit. Of course, as a matter of logic, Major Finn could not have been discriminating against Plaintiff at that time, based on a disability that was not yet in existence.

[4]As with the NPR breach, Plaintiff takes considerable time and effort to argue she was not responsible for the second security violation. See Pl. Stmt. at ¶7. Again, whether Plaintiff was properly charged with, and reprimanded for, the classified material breach (and whether others were treated more favorably before she was diagnosed with her medical condition) is not relevant to her disability discrimination claim.

Stmt. Ex. 21. Meanwhile, the investigation into the second breach continued.

On October 9, 2002, Major Finn informed Plaintiff by memorandum that her suspension to classified materials was being continued "because I have lost faith in your ability to properly protect classified information. Your recent security incidents have raised serious doubts in your reliability, trustworthiness and ability to protect classified information." See Def. Stmt. Ex. 9.

On October 15, 2002 --- six days after the letter from Major Finn --- Plaintiff began seeking treatment with Dr. W.P. "Ab" Abercrombie. Def. Stmt. Ex. 13. Dr. Abercrombie is not a licensed medical doctor, but rather he holds a PhD in Human Services and is a Marriage and Family Therapist and social worker. See id.; see also Def. Stmt. Ex. 12. By letter, dated October 17, 2002, Dr. Abercrombie diagnosed Plaintiff as suffering from "dysthymia," see Def. Stmt. Ex. 13, which is a disorder characterized by chronic mildly depressed or irritable mood accompanied by other symptoms, such as eating or sleeping disturbances, fatigue, and poor self-esteem. Plaintiff testified during her deposition that she began feeling the symptoms of this condition in or about March 2002 (around the time of the NPR security breach), see Def. Stmt. Ex. 11 at 24-25; see also Pl. Stmt. at ¶8, yet she did not seek treatment until she visited Dr. Abercrombie in October 2002 (shortly after the second security breach). Prior to seeing Dr. Abercrombie, Plaintiff had not sought treatment or mental health counseling of any kind. See Def. Stmt. Ex. 11 at 26. It is, therefore, clear that Plaintiff's dysthymia developed after --- and apparently because of --- the two security breaches and subsequent discipline. In fact, Plaintiff specifically told Dr. Abercrombie that her depression and anxiety were "related to a troubled work environment [that] . . . follow[ed] a safety violation and disciplinary action on the part of her superior." See Pl. Stmt. Ex. 11.

In his initial evaluation, Dr. Abercrombie opined that Plaintiff had "significant work related problems that play a major role in her depression" and that she should "take a one month leave of absence . . . [to] address these issues completely." See

Def. Stmt. Ex. 13. He further recommended psychotherapy and an evaluation by a medical doctor to determine if antidepressant medication would be appropriate. See id. Notably, Dr. Abercrombie told Plaintiff: "The prognosis for this condition, given proper treatment, is good. *There is no reason you should not recover fully from this depressive state with therapy and possibly the use of medication.*" See id. (emphasis supplied). Dr. Abercrombie recommended that Plaintiff return for follow-up after her 30-day leave of absence so that he could determine her "readiness for work at that time." See id.[5]

After her initial treatment with Dr. Abercrombie, Plaintiff began taking Celexa, an antidepressant. See Def. Stmt. Ex. 11 at 26-31. In addition, she asked HQ for the leave of absence that Dr. Abercrombie had recommended, and Major Finn authorized the leave.  See Def. Stmt. Ex. 14. Several days before Plaintiff was expected to return to work, however, on November 13, 2002, Dr. Abercrombie decided that her progress was insufficient, so he recommended that she take another 30-day leave of absence. See Def. Stmt. Ex. 15; Pl. Stmt. at ¶12. Major Finn authorized this second leave as well. See Pl. Stmt. at ¶12. Although it is somewhat unclear in the record, it appears Plaintiff *did not* return to HQ after the second leave of absence expired. Instead, on January 2, 2003, Dr. Abercrombie recommended that she take another 30-days off; Major Finn authorized this third request as well. See Pl. Stmt. at ¶12. These facts make clear that during her extended leaves of absence, both Dr. Abercrombie and HQ believed that Plaintiff's condition was temporary and was being addressed with a therapy regime that would allow her to return to work in the near future.

Plaintiff returned to work at some point in February 2003. See Def. Stmt. Ex.

---

[5]Dr. Abercrombie also diagnosed Plaintiff with chronic neck and back pain. See Def. Stmt. Ex. 13. However, Plaintiff apparently does not claim her disability is based on those conditions. See, e.g., Complaint (Doc. 1) at ¶7 (alleging Plaintiff is disabled because she "suffers from severe depression and anxiety"); see also Def. Stmt. Ex. 11 at 24 (in which Plaintiff testified the disability at issue is "stress and anxiety").

11 at 63. Upon her return to the office, she noticed that Major Finn had left certain forms on her desk, namely: referral information for mental health care, a separation sheet, and vacancy announcements for other employment positions. See Complaint (Doc. 1) at ¶12; see also Def. Stmt. Ex. 11 at 62-63. Plaintiff did not ask Major Finn for this documentation, and she believes Major Finn left them for her as a "hint" that she should leave HQ. See Def. Stmt. Ex. 11 at 62-63.

On February 25, 2003, Plaintiff, through counsel, wrote a letter to Major Finn and requested an "accommodation due to her medical disability." See generally Def. Stmt. Ex. 16. The record suggests, and Plaintiff appears to agree, this was the first time HQ learned that she claimed to have a disability. See Def. Stmt. Ex. 11 at 48. Attached to the letter was an earlier letter from Dr. Abercrombie, dated February 8, 2003, in which he opined that Plaintiff suffered from depression "directly related to her work environment" and the "threat, harassment, and pressure, coming from her superior, Major Karen Finn." See Def. Stmt. Ex. 16. To accommodate Plaintiff, Dr. Abercrombie requested that she be "separated professionally" from Major Finn and, further, that "an equitable alternative position be provided." See id. Dr. Abercrombie explained the separation and transfer were "absolutely necessary for her health and well-being" and, if not authorized, would result in continued symptoms and perhaps exacerbate her condition. See id.

On March 4, 2003, Plaintiff requested a fourth leave of absence, this one for an indefinite period of time. Plaintiff attached to her request a new letter from Dr. Abercrombie, dated March 3, 2003, in which he stated the workplace at HQ had a "deleterious effect" on her psychological well-being and her depression and anxiety were "far worse." Dr. Abercrombie believed that Plaintiff was being systematically harassed by Major Finn (specifically because of the several forms and referral sheets that were left on her desk in February 2003), and this harassment was "a punitive response" to Plaintiff trying to secure transfer to a new department. See Pl. Stmt. Exs. 11, 17. Major Finn neither approved nor disapproved this fourth leave request.

See Pl. Stmt. at ¶14.[6]

On March 10, 2003, Dr. Abercrombie wrote a letter to Lt. General Paul V. Hester, advising him of Plaintiff's medical condition.  Again, Dr. Abercrombie stated that, if treated properly, Plaintiff's prognosis was "good" and there was "no reason [she] should not recover *fully* from this depressive state with therapy and the use of medication." See Def. Stmt. Ex. 18 (emphasis supplied). However, Dr. Abercrombie opined that Plaintiff would not recover as long as she worked with Major Finn, so he recommended that she be "separately professionally" from her and assigned a new position. See Def. Stmt. Ex. 18

Major Finn acknowledged receipt of the letter from Plaintiff's counsel and Dr. Abercrombie on March 17, 2003. Major Finn informed Plaintiff, however, that the information provided "is not sufficient for me to make an informed decision on your request for accommodation." Major Finn requested that Plaintiff provide additional information, including a more detailed description of her alleged disability, its source, its expected duration, how the condition affects major life activities (including work performance), and why an accommodation is required. See Def. Ex. 19.

On April 10, 2003, Dr. Abercrombie responded to Major Finn's request for additional information. He described in further detail how Plaintiff's anxiety and depression affected her ability "to perform the MAJOR DUTIES of her position as outlined in her job description." See Def. Stmt. Ex. 20 (capitals in original). He further noted that Plaintiff's "personal life" was affected inasmuch as "she has become reclusive and withdrawn, with basically little or no social contact. Her fatigue and lethargy has limited the scope of her daily operations, and she is not fully functional in any sphere at this time." See Def. Stmt. Ex. 20. Nonetheless, Dr. Abercrombie

---

[6]Obviously, Dr. Abercrombie could not have determined the documentation was left on Plaintiff's desk as a "punitive response" to her requesting a transfer to a different supervisor because, at least according to Plaintiff, she did not request the transfer until after the incident. See Def. Stmt. Ex. 11 at 62-63.

opined that her prognosis was "good" if she were permitted to work in a different environment and with a new superior. See id. Indeed, Dr. Abercrombie went so far as to note that Plaintiff "could again become *fully functional* at her level of professional standing" if only she were allowed to work in a different setting, "outside the control of [Major Finn]." See id. (emphasis supplied).

On April 21, 2003, Major Finn wrote to Plaintiff and acknowledged receipt of the letter from Dr. Abercrombie. Major Finn decided the information provided to her "does not support the conclusion you are disabled." Major Finn also explained that it was not possible to separate Plaintiff from her because "[n]o one else in the chain of leadership is qualified to evaluate your Public Affairs work, and close coordination is required between my deputy and myself on many important issues regarding this Directorate." See Def. Stmt. Ex. 22.[7]

In her letter of April 21, 2003, Major Finn advised Plaintiff that she had only been authorized for sick leave up through April 11, 2003, but she had not yet returned to work. On April 23, 2003, Plaintiff requested another 30 days of leave; Major Finn told Plaintiff that she was granted leave only until May 1, 2003, but she was expected to return on that date. See Def. Stmt. Exs. 22, 23.

It appears Plaintiff returned to work for a short time after her leave expired. However, by July 18, 2003, Plaintiff was apparently on leave once again when she applied for disability retirement. See Pl. Stmt. at ¶18. By letter dated July 15, 2003, Dr. Abercrombie wrote to the "Federal Employees Retirement System" in support of

---

[7]Plaintiff now claims she was willing to take a demotion (or "downgrade") as part of the transfer. See Def. Stmt. Ex. 11 at 60-61; Pl. Stmt. at ¶20. However, this claim is contradicted by certain evidence in the record. For example, Dr. Abercrombie made clear in his several letters to HQ that Plaintiff was only seeking transfer to an "equitable" position. Furthermore, Plaintiff testified at deposition that she was upset by the job vacancy postings that Major Finn left on her desk specifically because the positions were for "a lower grade." See Def. Stmt. Ex. 11 at 63. Nonetheless, for purposes of this motion for summary judgment, I will assume Plaintiff was willing to take a demotion as part of her requested transfer.

Plaintiff's application for disability retirement. Dr. Abercrombie conveyed his opinion that the antagonistic work environment created by Major Finn, and failure to transfer Plaintiff to another position, made it impossible for Plaintiff ever to return to HQ. He further believed it was "doubtful" that Plaintiff would be able to return to the level of employment she had previously occupied, and thus in his opinion she was "permanently disabled."  See Def. Stmt. Ex. 24.

While Plaintiff's application for disability retirement was pending, in or about August 2003, Major Finn was transferred from HQ to Washington, D.C. See Def. Stmt. Ex. 3. Plaintiff was thereafter contacted by Major Finn's replacement, Colonel White, and asked to take the "fitness for duty" exam. See Def. Stmt. Ex. 11 at 41. Even though Major Finn had been transferred, Plaintiff did not want to return to HQ because she believed "the damage had been done." See id. at 42.

Plaintiff was ultimately granted disability retirement on or about December 11, 2003. See Pl. Stmt. Ex 18. Within a few months thereafter, she stopped treatment with Dr. Abercrombie. When asked why she stopped the treatment, Plaintiff stated it was because she had retired from her employment with the Air Force and wanted "to move forward with [her] life." See Def. Stmt. Ex. 11 at 27-30, 47. It appears from the record evidence that Plaintiff has done just that, as she is now working at a new job (as a residential property appraiser), she is not taking antidepressant medication, and she is not under the care of any mental health counselor, psychologist, or social worker. See id. at 12-14, 31-32. Although she would not go so far as to say that she is "completely great," Plaintiff concedes her psychological condition improved once she was "outside of the work environment." See id. at 31, 42.

B.    Procedural History

As previously noted, Plaintiff first requested her accommodation (to wit, the transfer away from Major Finn) by letter of February 25, 2003. The following week, on March 4, 2003, Plaintiff contacted an Equal Employment Opportunity ("EEO") counselor and claimed she had been discriminated against based upon disability and

race.[8] Plaintiff alleged the failure to transfer her from Major Finn constituted a denial of reasonable accommodation. In addition, she claimed Major Finn harassed her by leaving the various referrals on her desk in February 2003. See Def. Stmt. Ex. 17.

On April 17, 2003, after she was told the EEO Office was not able to resolve her informal EEO complaint, Plaintiff filed a formal charge and alleged both race and disability discrimination, as well as hostile work environment harassment. See Def. Stmt. Ex. 21. Several months later, on December 31, 2003, the Office of Complaint Investigations informed Plaintiff that the investigation into her complaint had been completed and she had thirty days to request a hearing before an Equal Employment Opportunity Commission Administrative Judge or request a final agency decision on the record. See Def. Stmt. Ex. 25. Plaintiff was informed that if neither option was elected, then a final agency decision would be made on the record. See id. Plaintiff did not request a hearing, and on November 8, 2004, the Air Force Review Boards issued a final agency decision and found no discrimination or harassment. See generally Def. Stmt. Ex. 26. This lawsuit followed.

In the operative allegations of her Complaint, Plaintiff has not pled race discrimination or hostile work environment; instead, the only claim at issue involves disability discrimination under the Rehabilitation Act of 1973 ("the Act"). Defendant has moved for summary judgment, arguing Plaintiff cannot establish a prima facie case for discrimination, as discussed in section II.B, below.[9]

---

[8]Plaintiff is Caucasian; Major Finn is African-American.

[9]Plaintiff asserts in the "Factual Allegation" portion of her Complaint that Major Finn made certain "belittling comments" and threatened suspension after she learned of the alleged disability. However, as noted above, Plaintiff has not stated a cause of action for hostile work environment; nor has she pled a cause of action for retaliation. Instead, the sole issue to be decided is whether Plaintiff was discriminated against by being denied a "reasonable accommodation." Consequently, I will not address those collateral allegations.

II.    **APPLICABLE LAW**

A.    <u>Summary Judgment Standard</u>

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986); <u>see</u> <u>also</u> <u>Morisky v. Broward County</u>, 80 F.3d 445, 447 (11th Cir. 1996).

However, summary judgment will be inappropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact will be "material" if it might affect the outcome of the case under the governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211 (1986). It is "genuine" if the record taken as whole could lead a rational trier of fact to find for the non-moving party. <u>Id.</u>; <u>see</u> <u>also</u> <u>Matsushita Electric Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact.  <u>See</u> <u>Leigh v. Warner Bros., Inc.</u>, 212 F.3d 1210, 1217 (11th Cir. 2000); <u>see</u> <u>also</u> <u>Ramsey v. Leath</u>, 706 F.2d 1166, 1170 (11th Cir. 1983). On a summary judgment motion, the record evidence and all reasonable inferences drawn therefrom must be viewed in a light most favorable to the non-moving party. <u>National Fire Ins. Co. of Hartford v. Fortune Const. Co.</u>, 320 F.3d 1260, 1267 (11th Cir. 2003); <u>Whatley v. CNA Ins. Cos.</u>, 189 F.3d 1310, 1313 (11th Cir. 1999).

Despite that employment discrimination cases are frequently fact-intensive, it is well settled "the summary judgment rule applies in job discrimination cases just as in other cases." Chapman v. AI Transport, 229 F.3d 1012, 1026 (11th Cir. 2000); accord Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."). At the summary judgment stage, the question is "whether an ordinary person could reasonably infer discrimination if the facts presented remain unrebutted." See Williams v. Vitro Services Corp., 144 F.3d 1438, 1441 (11th Cir. 1998) (citations and quotation marks omitted).

      B.      Disability Discrimination under the Act

Section 501 of the Act imposes upon federal agencies an affirmative duty to ensure that handicapped individuals have equal access to employment opportunities. See § 501(b) of the Act, codified at 29 U.S.C. § 791(b). After the enactment of the Americans with Disabilities Act of 1990 ("ADA"), which prohibits discrimination by private employers against disabled employees, section 501 of the Act was amended to provide that the applicable standards in determining violations of the Act shall be the same as those applied under the ADA. See § 504(d) of the Act, codified at 29 U.S.C. § 794(d). Accordingly, I must look to the regulations promulgated under the ADA and the Act, as well as case law interpreting both statutes, in considering the merits of Plaintiff's discrimination claim. Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1526 (11th Cir. 1997); see also Sutton v. Lader, 185 F.3d 1203, 1208 n.5 (11th Cir. 1999) ("The standard for determining liability under the Rehabilitation Act is the same as that under the ADA").

The Act prohibits federal agencies from discriminating in employment against "otherwise qualified individuals with a disability." Sutton, *supra*, 185 F.3d at 1207. The burden of establishing a prima facie case of disability discrimination falls on the shoulders of the complaining employee. Id.; see also, e.g., Davis v. Florida Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000); Holbrook, *supra*, 112 F.3d at 1526.

To establish a prima facie case, an employee must prove that: (i) she has a disability; (ii) she is a qualified individual who could perform all the essential functions of her job with or without a reasonable accommodation; and lastly, (iii) she was subjected to discrimination because of her disability. E.g., Davis, *supra*, 205 F.3d at 1305. Once an employee establishes a prima facie case, the employer must present a legitimate, non-discriminatory reason for the adverse action it took against the employee. See Wascura v. City of South Miami, 257 F.3d 1238, 1242-43 (11th Cir. 2001). If the employer satisfies this intermediate burden, the employee must then come forward with evidence demonstrating that the stated reason is a mere pretext for unlawful discrimination. Id.

In order to satisfy the first element of her prima facie case, Plaintiff must prove that she is a disabled individual. Not every impairment is automatically a disability under the ADA. E.g., Sutton, *supra*, 185 F.3d at 1208. Instead, the ADA requires plaintiffs to prove the extent of limitation caused by the impairment is substantial. Toyota Mfg., Ky, Inc. v. Williams, 534 U.S. 184, 195-99, 122 S. Ct. 681, 690-92, 151 L. Ed. 2d 615 (2002). The ADA thus defines a "disabled individual" as one who (a) has a physical or mental impairment that substantially limits one or more major life activities; (b) has a record of such an impairment; or (c) is regarded as having such an impairment. See 42 U.S.C. § 12102(2). "Substantially limits" means "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." Hilburn v. Murata Electronics North America, Inc., 181 F.3d 1220, 1226 (11th Cir. 1999) (citation and quotation marks omitted). In deciding whether an impairment substantially limits a major life activity, district courts are instructed to consider "(1) the nature and severity of the impairment; (2) the *duration or expected duration of the impairment*; and (3) the

permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." Sutton, *supra*, 185 F.3d at 1208 (emphasis in original) (citation omitted). "Major life activities" are defined in the applicable regulations as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). With respect to the latter, an employee is substantially limited in the major life activity of working if she is significantly restricted in ability to perform "either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Notably, "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Id.

At the second step of her prima facie case, Plaintiff must prove that she is a "qualified individual" for purposes of the Act. The Eleventh Circuit has held that the determination of whether an individual is qualified under the ADA will involve a two-step process. "First, does the individual satisfy the prerequisites for the position; does the individual have sufficient experience and skills, adequate educational background, or the appropriate licenses for the job? . . . Second, can the individual perform the essential functions of the job, either with or without reasonable accommodations?" Reed v. Heil Co., 206 F.3d 1055, 1062 (11th Cir. 2000) (citing 29 C.F.R. Pt. 1630, App. 352-53). The term "essential functions" means the fundamental duties of the employment position at issue. See, e.g., D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220,1230 (11th Cir. 2005) (citing 29 C.F.R. § 1630.2(n)(1)). In determining what duties are essential, "consideration shall be given to the employer's judgment." 42 U.S.C. § 12111(8). If an employee cannot perform all the essential functions of her job with or without an accommodation, then she is not qualified and, *a fortiori*, her claim must fail. Cramer v. Florida, 117 F.3d 1258 (11th Cir. 1997).

To satisfy the third and final step of her prima facie case, Plaintiff must prove that she was subjected to unlawful discrimination based on disability. This may be

shown, as is alleged in this case, where a qualified employee is denied a reasonable accommodation. <u>Stewart v. Happy Herman's Cheshire Bridge, Inc.</u>, 117 F.3d 1278, 1285 (11th Cir. 1997). Under the ADA, "reasonable accommodations" may include "'job restructuring, parttime or modified work schedules, reassignment to a vacant position . . . and other similar accommodations for individuals with disabilities.'" <u>Id.</u> (quoting 42 U.S.C. § 12111(9)(B)). The foregoing list notwithstanding, "'the use of the word 'reasonable' as an adjective for the word 'accommodate' connotes that an employer is not required to accommodate an employee in any manner in which that employee desires.'" <u>Id.</u> (citation omitted). Stated differently, a protected employee is not entitled to any and all accommodations of her choice, but only to a reasonable accommodation. <u>Id.</u> at 1286.

## III.   DISCUSSION

Defendant has argued that Plaintiff fails at each and every step of her prima facie case, namely that (i) she is not disabled; (ii) she is not a qualified individual; and (iii) the failure to separate her from Major Finn was not discrimination because the requested accommodation was unreasonable. Each argument will be discussed in turn below.

### A.   Whether Plaintiff is "Disabled" under the Act

As noted, a person will be deemed disabled under the Act when she (i) has an impairment that substantially limits major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment. Although it is not clear from her pleadings, it appears that Plaintiff is only claiming that she satisfies the (i) "major life activities" definition. <u>Cf.</u> Complaint (Doc. 1) at ¶7 (alleging Plaintiff is disabled only because she "suffers from severe depression and anxiety that adversely affect her ability to engage in major life activities and activities of daily living"). Moreover, Defendant has argued on summary judgment that Plaintiff does not meet the (ii) and (iii) standards, and yet Plaintiff has not responded to the argument. Nonetheless, for completeness of the record, I will consider if Plaintiff meets any of

the three definitions of disability.

   **(i) Qualified impairment.** I begin by noting that depression may indeed qualify as a protected disability under the Act. See, e.g., Pritchard v. Southern Co. Services, 92 F.3d 1130, 1132 (11th Cir. 1996). Of course, this does not mean that depression will always constitute a disability. See id. at n.3 ("'The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.'") (quoting 29 C.F.R. § 1630.2(j)). The question for this case, therefore, is whether *Plaintiff's* individualized depression was severe enough to limit *her* major life activities.

  Defendant argues that to constitute an impairment in the major life activity of working, Plaintiff must prove more than a mere inability to perform a particular job. Because Plaintiff has not shown, or indeed claimed, that she is unable to perform a broad class of jobs (but instead is only limited to working in a particular job with a particular supervisor), Defendant argues that Plaintiff is not limited in the major life activity of working. The law supports this argument. See Patrick v. Southern Co. Services, 910 F. Supp. 566, 569 (N.D. Ala.), aff'd, 103 F.3d 149 (11th Cir. 1996) ("[A] person who merely cannot work on particular job(s) at particular place(s) is not considered to be disabled. In order to establish a disability under the ADA, the impairment must substantially limit employment generally"). Numerous cases --- many with strikingly similar facts --- have, therefore, held that depression and anxiety caused by working with a particular supervisor or co-employee will not constitute a substantial impairment in the major life activity of working. See, e.g., Ozlek v. Potter, 2006 WL 964484, at *4 (E.D. Pa. April 13, 2006) (collecting and discussing cases); Formosa v. Miami Dade Community College, 990 F. Supp. 1433 (S.D. Fla. 1997); Gaul v. AT&T, Inc., 955 F. Supp. 346, 351 (D.N.J. 1997); Hatfield v. Quantum Chemical Corp., 920 F. Supp. 108 (S.D. Tex. 1996); DeWitt v. Carsten, 941 F. Supp. 1232 (N.D. Ga. 1996), aff'd., 122 F.3d 1079 (11th Cir. 1997); accord MacKenzie v. City

and County of Denver, 414 F.3d 1266, 1276 (10th Cir. 2005) ("the major life activity of working cannot be 'substantially impaired' if a plaintiff cannot work under a certain supervisor because of the stress and anxiety it causes"); Weiler v. Household Finance Corp., 101 F.3d 519, 524 (7th Cir. 1996) ("[t]he major life activity of working is not 'substantially limited' if plaintiff merely cannot work under a certain supervisor because of anxiety and stress . . .").

But, Plaintiff appears to claim that her depression and anxiety limited other major life activities as well. See Complaint (Doc. 1) at ¶7; see also Pl. Stmt. at ¶17. Thus, in his letter of April 10, 2003, Dr. Abercrombie determined that Plaintiff was "limited [in] the scope of her daily operations . . . [and] not fully functional in any sphere" at that time. See Def. Stmt. Ex. 20. Accordingly, for completeness, I expand the question beyond whether Plaintiff is substantially limited in the life activity of working (for clearly she is not), but rather whether she is limited in other major life activities.[10]

Upon close and full review of the record, I have determined that Plaintiff simply does not have a qualified disability. First, although Dr. Abercrombie's several letters do indicate that Plaintiff is limited to some unspecified degree, Plaintiff has provided no evidence from which a reasonable jury could find that she is restricted in major life activities *as compared with* an average person in the general population. See, e.g., Hilburn, *supra*, 181 F.3d at 1228 (holding that diminished tolerance for normal daily activities does not by itself constitute substantial limitation as required by the ADA). Morever, even if Plaintiff had provided such evidence, it is clear in the record that any such restriction would have been a temporary and transitory phenomenon brought on

---

[10]For example, Dr. Abercrombie stated in his April 2003 letter that Plaintiff's condition had led to, *inter alia*, sleep disturbances. See also Def. Stmt. Ex. 11 at 34. Moreover, Plaintiff had a suppressed appetite and lost weight during this period. See, e.g., Def. Stmt. Ex. 11 at 25, 34; Def. Stmt. Ex. 24. Both eating and sleeping may constitute major life activities. See Collado v. United Parcel Serv., Co., 419 F.3d 1143 (11th Cir. 2005) (eating). Rossbach v. City of Miami, 371 F.3d 1354 (11th Cir. 2004) (sleeping).

by her apparent reluctance to work with Major Finn after the two security violations were discovered and investigated. To be sure, with the exception of a single and isolated letter (discussed below), Dr. Abercrombie repeatedly stated that Plaintiff's prognosis was good and that she was expected to recover fully after treatment. This is simply not the sort of impairment contemplated by the ADA. See, e.g., 29 C.F.R. Pt. 1630, App. § 1630.2(j) ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities"); see also Toyota Mfg., Ky, Inc., supra, 534 U.S. at 198 (stating "[t]he impairment's impact must also be permanent or long term"); Sutton, supra, 185 F.3d at 1209 (noting a temporary condition does not constitute a "disability"); Johnston v. Henderson, 144 F. Supp. 2d 1341, 1352 (S.D. Fla. 2001) ("The law is well settled that temporary, nonchronic impairments of short duration, with little or no long-term or permanent impact, are not disabilities as defined by the Act") (collecting cases). Indeed, as the court concluded about a similar condition in Adams v. Alderson, 723 F. Supp. 1531 (D.D.C. 1989):

> Adams' present psychiatrist (and expert witness) describes his condition as a "maladaptive reaction to a psychosocial stressor," viz., the antagonizing supervisor, which is, however, a transitory phenomenon that can be expected to disappear when the "psychosocial stressor" is removed. It is, therefore, hardly an "impairment" which "substantially limits one or more . . . major life activities."

Id. at 1531 (citation omitted); accord Weiler, supra, 101 F.3d at 525 ("If [a plaintiff] can do the same job for another supervisor, she can do the job," and she is therefore "not 'disabled' as that term is used in the ADA."); Palmer v. Circuit Court of Cook County, Social Service Dept., 905 F. Supp. 499, 507 (N.D. Ill. 1995) (rejecting claim that plaintiff was disabled by anxiety and stress caused by working with a particular supervisor; noting that "'[a] disability is a part of someone and goes with her to her next job . . .'") (citation omitted).

Complicating the issue somewhat, however, is Dr. Abercrombie's letter of July

15, 2003. In that correspondence, Dr. Abercrombie was writing in support of Plaintiff's application for medical disability retirement, and he opined that her prognosis was "guarded" and that it was "doubtful" she would recover fully. He concluded that she was "permanently disabled." See Def. Stmt. Ex. 24. At first blush, this letter would appear to create a genuine issue of fact as to whether Plaintiff did, in fact, have a medical impairment of sufficient duration and severity. Nevertheless, there are two reasons why this letter does not alter my conclusion that Plaintiff is not disabled.

First, in deciding if an employee is disabled under the ADA, the only relevant time period to consider is when the complained-of discrimination took place. E.g., Slomcenski v. Citibank, N.A., 432 F.3d 1271, 1280-81 (11th Cir. 2005); Johnston, supra, 144 F. Supp. 2d at 1353 (to be protected under the ADA an employee must have been disabled "at the time" of the adverse job action); accord Browning v. Lib. Mutual Insurance Co., 178 F.3d 1043, 1047 (8th Cir. 1999) (the decision of whether an employee is disabled under ADA must be made "as of the time of" the adverse action); Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 884 (6th Cir. 1996) (to prove disability discrimination under the ADA a plaintiff "must first establish as part of her prima facie case that she was a 'qualified individual with disability' *at the time of the discriminatory act*") (emphasis in original); cf. Pritchard, supra, 92 F.3d at 1133 (the relevant question in disability discrimination case is whether employee had the claimed impairment "when she was terminated"). According to Plaintiff's formal and informal EEO complaints, the discrimination here occurred in March 2003 --- that is, when she was denied a transfer. See Def. Stmt. Exs. 17, 21. At that time, several months before the July 2003 correspondence, both Dr. Abercrombie and Defendant were still of the opinion that her depression was temporary, that her prognosis was "good," and that she was expected to make a full recovery. It is of no moment that, according to Dr. Abercrombie, Plaintiff's medical condition and symptoms worsened after the alleged discrimination. Durley v. APAC, Inc., 236 F.3d 651, 657 (11th Cir. 2000); see also Cash v. Smith, 231 F.3d 1301, 1306 n.5 (11th Cir. 2000) ("The fact

that Cash was eventually hospitalized for depression in July and September 1998 is irrelevant to this case. The employment action that Cash is complaining of occurred in late April and early May of 1998, and we evaluate her disability as manifested at that time."). The July 2003 letter is, therefore, not relevant in determining if Plaintiff was disabled at the time of the alleged discrimination.[11]

In any event, the record is undisputed that Plaintiff is not permanently disabled. Indeed, Plaintiff is now working in a new profession, she does not take antidepressant medication of any kind, and she is not under the care of a counselor, psychologist, or social worker. Nor does she claim to have any *substantial* residual effects from her depression. Accordingly, the only possible inference is that, with the July 2003 letter, Dr. Abercrombie was merely restating his opinion that Plaintiff was permanently unable to work with Major Finn and, because of Defendant's failure to transfer her, she was unable to work at HQ at all. For the reasons stated above, an inability to work for a particular boss, or at a particular job site, is simply not a disability under the Act.[12]

**(ii) Record of impairment.** Having a "record" of a qualified impairment means the employee "'has a history of, or has been misclassified as having, a mental

---

[11]Even if the July 2003 letter did apply, Plaintiff's claim would still fail, however for a different reason. In that correspondence, Dr. Abercrombie opines that Plaintiff is *permanently disabled* and unable to work at HQ. Def. Stmt. Ex. 24. If this diagnosis is accepted as true, then Plaintiff is clearly not a "qualified individual" with a disability who could perform her job with or without reasonable accommodation. See section III.B, *infra*. Indeed, Abercrombie restricted Plaintiff from HQ "permanently."

[12]The July 2003 letter must also be understood in the context in which it was written. At that time, Dr. Abercrombie was writing in support of Plaintiff's pending application for disability retirement. It is thus not surprising that her prognosis was suddenly less favorable than it had ever been before; any indication that Plaintiff was only temporarily depressed and expected to recover fully would have likely defeated her claim for retirement benefits. This perhaps explains why the July letter stands in stark contrast to (and, in fact, contradicts) Dr. Abercrombie's other opinion letters.

or physical impairment that substantially limits one or more major life activities.'" Hilburn, *supra*, 181 F.3d at 1229 (quoting 29 C.F.R. § 1630.2(k)). To satisfy this definition of disability "'the impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities.'" Id. (quoting 29 C.F.R. Pt. 1630, App. § 1630.2(k)). The Eleventh Circuit has held "the record-of-impairment standard is satisfied only if [the plaintiff] actually suffered a physical impairment that substantially limited one or more of her major life activities." Id. (emphasis supplied). As explained in the preceding section, Plaintiff's depression does not meet this standard; it follows that she does not have a record of a qualified impairment.

**(iii) Regarded as having an impairment.** To prove that Major Finn and HQ regarded her as disabled, it is not enough for Plaintiff to argue that Defendant knew of her depression. Sutton, *supra*, 185 F.3d at 1209 ("The mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate that the employer regarded the employee as disabled."). Instead, Plaintiff must introduce "substantial evidence" that Defendant *believed* she had a "permanent or long-term impairment." Id. ("An employee who is perceived by his employer as having only a temporary incapacity to perform the essential functions of his job is not perceived as 'disabled' as defined by the Act."). On the facts of this case, there is no evidence suggesting that Defendant believed Plaintiff was substantially and permanently limited in any of her major life activities. To the contrary, all the record evidence from Dr. Abercrombie (with the exception of his July 2003 letter) suggests the opposite --- that is, Plaintiff only had a temporary condition for which she was seeking treatment and from which she was expecting a "full" recovery. Furthermore, the letter from Major Finn, dated April 21, 2003, and other evidence in the record, makes clear that Defendant did not believe Plaintiff was disabled; indeed, Major Finn believed Plaintiff was fully capable of returning to work at HQ. See Def. Stmt. Exs. 22, 23; Def. Stmt. at ¶28. Plaintiff has made no attempt to dispute this assertion. Accordingly, she was not "regarded"

as disabled under the Act.

    B.    Whether Plaintiff is a "Qualified Individual"

    Although I have concluded that Plaintiff has not produced sufficient evidence from which a jury could find that she is disabled under any of the three alternatives of the Act, I will next consider Defendant's argument that Plaintiff was not a qualified individual at the time of the alleged discrimination.

    As noted, a person with a disability is "qualified" if she has the requisite skills, experience, and education for the job at issue and can perform all essential functions of that job with or without a reasonable accommodation. See 29 C.F.R. § 1630.2(m). Defendant argues, and Plaintiff has not disputed, that it was an "essential function" of her job as the Deputy Director of Public Affairs to have close and frequent contact with Major Finn, the Director of Public Affairs. See Def. Stmt. Ex. 2; Def. Stmt. Ex. 22. According to Dr. Abercrombie, at the time of the alleged discrimination Plaintiff was unable to work with Major Finn; *a fortiori*, Plaintiff was not a qualified individual with a disability. E.g., Earl v. Mervyns, Inc., 207 F.3d 1361, 1367 (11th Cir. 2000) ("an employer is not required by the ADA to reallocate job duties in order to change the essential functions of a job") (citation and quotation marks omitted).

    Plaintiff claims, however, that she could have been "separated professionally" from Major Finn and allowed to work in another department with a new supervisor. Defendant argues this was not reasonable accommodation under the Act.

    C.    Whether Plaintiff was Denied a "Reasonable Accommodation"

    In appropriate situations, an employee's "reassignment to a vacant position" may qualify as a reasonable accommodation. 42 U.S.C. § 12111(9)(B). However, it is Plaintiff's burden to show the alternative position was both vacant and one for which she was qualified. See Reed, *supra*, 206 F.3d at 1062; Stewart, *supra*, 117 F.3d at 1286. Here, Plaintiff claims (without citation to record evidence in support) that there were three vacant positions for which she was qualified. See Pl. Stmt. at

¶20.[13] Conclusory statements and unsupported claims do not create a genuine issue of material fact. See, e.g., Reed, supra, 206 F.3d at 1062-63 (summary judgment affirmed where employee alleged, but did not proffer evidence, that he was qualified for four vacant positions that he claimed as reasonable accommodation).

And in any event, even if I were to grant Plaintiff the benefit of the doubt and assume there were vacant jobs away from Major Finn for which she was qualified, there is still another reason for why her claim must fail: employees may not use the Act --- as Plaintiff is attempting here --- as the means to obtain a transfer from an undesirable boss. On this issue, there is an overwhelming unanimity of opinion in courts throughout the country. See Gaul v. Lucent Technologies Inc., 134 F.3d 576, 581 (3d Cir. 1998) ("[B]y asking to be transferred away from individuals who cause him prolonged and inordinate stress, Gaul is essentially asking this court to establish the conditions of his employment, most notably, with whom he will work. However, nothing in the ADA allows this shift in responsibility") (citation and quotation marks omitted); Weiler, supra, 101 F.3d at 526 ("The ADA does not require HFC to transfer Weiler to work for a supervisor other than Skorupka. . ."); Wernick v. Federal Reserve Bank of New York, 91 F.3d 379, 384 (2d Cir. 1996) (failing to transfer an employee to a different supervisor does not constitute denial of a reasonable accommodation; "Indeed, nothing in the law leads us to conclude that in enacting the disability acts, Congress intended to interfere with personnel decisions within an organizational hierarchy"); accord Ozlek, supra, 2006 WL 964484, at *5 ("Plaintiff's only requested accommodation was a transfer to a Post Office installation that was outside of the supervision of [a specific manager]. However, the law is clear that such a request is not reasonable") (collecting multiple cases); Langley v. DaimlerChrystler Corp., 407 F. Supp. 2d 897, 910 (N.D. Ohio 2005) (a "transfer requested so that the plaintiff will

_____

[13]Plaintiff has referred this Court to exhibits 19 and 20, attached to Doc. 30. Exhibit 19, an email correspondence, does reveal there were three vacancies during the relevant period. However, according to the email, it is unknown "which ones she may have been qualified for."

not be required to work with certain people is not reasonable accommodation" as "courts are not meant to act as a super-bureau of Human Resources") (citation and quotation marks omitted); Newby v. Whitman, 340 F. Supp. 2d 637, 657 (M.D.N.C. 2004) ("[A]n employer is not required to provide an aggravation-free or stress-free environment, or to reassign an employee away from a supervisor or coworker who may cause stress or conflict"); Brace v. IBM, 953 F. Supp. 561, 564 (D. Vt. 1997) ("It is well settled . . . that a reasonable accommodation an employer must make under [Vermont's state analogue to the ADA] does not include an obligation to transfer that employee solely to allow him to work under a different supervisor"); Kolpas v. G.D. Searle & Co., 959 F. Supp. 525, 530 (N.D. Ill. 1997) (noting "it is not a reasonable accommodation for an employer to have to transfer an employee to a position under another supervisor. That decision remains with the employer"); Lewis v. Zilog, Inc, 908 F. Supp. 931, 948 (N.D. Ga. 1995) (recognizing that "several courts have held transferring disabled individuals solely to allow the employee to work in a different setting or under a different supervisor is not an accommodation reasonably to be expected" because such "forc[ed] transfers . . . would undermine the employer's ability to control its own labor force" and give the disabled employees "preferential treatment to transfers over non-disabled persons"); Mancini v. General Elec. Co., 820 F. Supp. 141, 148 (D. Vt. 1993) (noting that transferring disabled employee "solely to allow the employee to work under a different supervisor is not an accommodation reasonably to be expected") (citation and quotation marks omitted); Adams, *supra*, 723 F. Supp. at 1531-32 (a plaintiff's request to be transferred from an offending supervisor is not reasonable accommodation as an employer "is entitled to assign its personnel as the needs of its mission dictate").

The above case law, and literally dozens of other cases not cited, make clear that Plaintiff's suggested accommodation was unreasonable as a matter of law.

## IV.   CONCLUSION

For the reasons stated above, Plaintiff does not have a disability for purposes

of the Act, nor is she a qualified individual capable of performing all the essential functions of her job with reasonable accommodation. Furthermore, even assuming *arguendo* that she is a qualified individual with a disability, the accommodation she seeks from Defendant is not reasonable as a matter of law. Therefore, Defendant's motion for summary judgment (Doc. 18) is GRANTED. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff, together with taxable costs.

**DONE and ORDERED this 29th day of June, 2006.**

/s/ *Roger Vinson*

**ROGER VINSON**
**Senior United States District Judge**